799 S.E.2d 290

### In the MATTER OF Robert Glenn BACON, Respondent.

**Appellate Case No. 2016-002271**
**Opinion No. 27710**

Supreme Court of South Carolina.

Submitted March 28, 2017
Filed April 19, 2017

---

Lesley M. Coggiola, Disciplinary Counsel, and Sabrina C. Todd, Senior Assistant Disciplinary Counsel, both of Columbia, for Office of Disciplinary Counsel.

Susan Batten Lipscomb, Lipscomb Law Firm, P.A., of Chapin, for respondent.

PER CURIAM:

In this attorney disciplinary matter, the Office of Disciplinary Counsel (ODC) and respondent have entered into an Agreement for Discipline by Consent (Agreement) pursuant to Rule 21 of the Rules for Lawyer Disciplinary Enforcement (RLDE) contained in Rule 413 of the South Carolina Appellate Court Rules (SCACR). In the Agreement, respondent admits misconduct and consents to the imposition of a public reprimand or a definite suspension not to exceed nine (9) months. We accept the Agreement and impose a definite suspension of six (6) months from the practice of law.

## Facts and Law

### The Loan Modification Matters

Prior to November of 2012, Mark Andrew Brunty, an attorney licensed to practice in South Carolina, hired INMN, Inc. (INMN), a marketing company, to solicit out-of-state clients interested in modifying their home loans. Brunty hired Integrity Partners, LLC (Integrity), to process the loan modifications. This Court placed Brunty on interim suspension on November 21, 2012, *In re Brunty*, 405 S.C. 572, 748 S.E.2d 777 (2012), and disbarred him on February 25, 2015, *In re Brunty*, 411 S.C. 434, 769 S.E.2d 426 (2015). About the time Brunty was placed on interim suspension, he introduced respondent to Terry Walden, the principal officer of Integrity, contemplating that respondent could assume Brunty's work with INMN and Integrity. Respondent questioned Walden multiple times to determine whether he could pursue the venture ethically. Respondent wrongly accepted Walden's assurances that Integrity and INMN were complying with federal laws and regulations and had a network of local attorneys licensed to practice in every jurisdiction in which clients were accepted.

Subsequently, respondent hired INMN to solicit out-of-state clients interested in mortgage modifications and to hire Integrity to process the modifications, as Brunty had. However, he did not instruct Integrity regarding issues related to Brunty's

existing loan modification clients. Integrity employees continued working on some of these clients' files when no licensed attorney was involved in the matter. Integrity employees also incorrectly advised many of Brunty's clients that their files had been assigned to respondent's firm. Some of Brunty's clients later became respondent's clients, but others did not. Finally, Integrity employees charged installment payments of fees to the credit cards of some of Brunty's clients. Although the clients originally authorized these payments to be made to Brunty, their credit cards were charged in favor of respondent's firm.

Respondent admits he violated federal rules against unfair or deceptive acts or practices with respect to loan modification matters.[1] Because respondent was not licensed to practice in any of the jurisdictions in which he accepted loan modification clients, he was not authorized to accept any fees before the client executed a loan modification agreement. Further, respondent failed to deposit the fees he received into a trust account, failed to maintain separate ledgers for his clients, and failed to properly supervise those who had access to the accounts into which loan modification clients' fees were deposited.

Respondent also failed to properly supervise INMN's marketing of his loan modification services. INMN salespeople identified themselves as employees of respondent's firm when communicating with prospective clients despite a contractual obligation to disclose their actual connection with the firm. When respondent learned of this practice, he insisted that it stop immediately. After respondent ceased using INMN's marketing services, he learned the company had created a

---

1. In 2009, Congress directed the Federal Trade Commission to prescribe rules prohibiting unfair or deceptive acts or practices with respect to mortgage loans; these provisions were subsequently codified at 12 C.F.R. Part 1015 and ultimately named "Regulation O." Regulation O places a number of restrictions on those who wish to provide mortgage relief services. For example, a provider may accept a fee only after the client has executed a written agreement for relief with the client's lender or lender's servicer. 12 C.F.R. § 1015.5. Attorneys are exempt from this rule if they meet certain criteria, including the attorney must be licensed to practice in the state where the consumer or the consumer's home is located, must hold any advance fee in a client trust account until earned, and comply with applicable trust account rules. 12 C.F.R. § 1015.7.

website without his approval which INMN shared with prospective clients.

Respondent acknowledges he did not take sufficient efforts to ensure the nonlawyer employees of Integrity and INMN conducted themselves in a manner compatible with respondent's own professional obligations. Additionally, respondent admits he failed to fully investigate whether he could properly accept and represent loan modification clients in other jurisdictions. Respondent is not licensed to practice law in any other state. Consequently, respondent engaged in the unauthorized practice of law in several jurisdictions.

## A.   The California Matter

Client A agreed to hire respondent's firm after an INMN employee told him that if he hired respondent and then changed his mind about pursuing a loan modification, he would be entitled to a refund of any unearned fees. Three days after making an initial payment, Client A decided to file for bankruptcy using a California law firm. Client A immediately informed his INMN contact and requested a refund. He was promised a refund of one-half of the $1,500 payment he made, but respondent cannot show a refund was issued. By charging and collecting an upfront fee in a loan modification case, respondent admits he violated California Civil Code § 2944.7. Furthermore, respondent admits his conduct constituted the unauthorized practice of law in violation of § 6125 of the California Business and Professional Code and Rule 1-300 of the California Rules of Professional Conduct.

## B.   The Connecticut Matters

Clients B and C, who were married, hired and paid Brunty to obtain a modification of their mortgage. Upon Brunty's suspension, Integrity employees continued working on Client B and C's file for a period of time. They notified the couple their file had been transferred to respondent's firm. Integrity employees also asked the couple to complete a form authorizing their bank to communicate with respondent's firm. However, the couple never became respondent's clients. Respondent admits his failure to properly supervise Integrity employees caused confusion for Clients B and C. He also admits he failed to clarify the situation to the couple in writing, violating Rules

1.16 and 5.3(1) of the Connecticut Rules of Professional Conduct.

Client D originally hired Brunty and made two of three payments to his firm. A payment of $966 was charged in favor of respondent's firm without Client D's authorization. Respondent was required by Connecticut rules to hold the funds in an IOLTA account at an institution authorized to do business in Connecticut but admits he failed to do so.

Respondent admits his conduct violated Rules 1.15(d), (h), and 5.5(c) of the Connecticut Rules of Professional Conduct.

## C. The Georgia Matter

Client E received an email solicitation from an INMN employee who identified himself as an Underwriting Specialist for respondent's office. The INMN employee advised Client E her payment would be deposited into a trust account where it would remain until earned and that it would be immediately refunded if her bank did not agree to work with respondent's firm. He also stated to Client E:

I personally have seen very few modifications that we accept that do not go through. The lenders tend to tell you anything to keep you from hiring someone like us. Because we do approximately 250 modifications per month, we know who will and who will not work with us because those who in the past have not agreed to work with us, have found they [sic] we will elevate the situation by doing forensic audits and such, which believe me when I tell you, they want to avoid at all costs.

Respondent admits these statements were misleading. Shortly after making a payment of $967, Client E was interviewed by an employee of respondent's firm to make certain the firm could assist her. Client E incorrectly reported she had not previously received a loan modification. Respondent claims if Client E had reported correctly that she had received a loan modification, he would have issued a refund to Client E because the firm would not have been able to help her. Respondent later did refund $600 to Client E pursuant to an award of the South Carolina Resolution of Fee Disputes Board. Respondent admits his firm's representation of Client E constituted the unauthorized practice of law in Georgia in

violation of Rule 5.3, 5.5 and 7.1 of the Georgia Rules of Professional Conduct.

## D. The Kentucky Matter

Client F hired Brunty to modify her home loan. However, her final payment for Brunty's legal services became due after his interim suspension. The final payment of $725 was charged to her credit card and paid to respondent's firm, even though she had not hired that firm. Her loan modification was denied shortly thereafter. Respondent admits his conduct in this matter violated Rule 3.130(1.5), (1.6) and (5.3) of the Rules of Professional Conduct of the Rules of the Kentucky Supreme Court.

## E. The New Jersey Matter

Client G paid respondent's firm $1,934 to negotiate a loan modification. He received a loan modification offer, but rejected it and requested a refund. Respondent refunded $1,934 to Client G before receiving notice of ODC's investigation. However, by negotiating a loan modification for Client G, respondent admits he acted as an unauthorized debt adjuster in violation of New Jersey law. N.J.S.A. § 17-16G-2. Furthermore, respondent admits his conduct constituted the unauthorized practice of law in violation of Rule 5.5 of the New Jersey Rules of Professional Conduct.

## F. The North Carolina Matter

Clients H and I, who were married, paid respondent $2,900 to negotiate a modification of their home loan. An INMN employee told the couple respondent could potentially reduce their monthly mortgage payment by more than half. Respondent admits the INMN employee's statement likely created an unjustified expectation about the result respondent could achieve in violation of Rule 7.1(a)(1) of the North Carolina Rules of Professional Conduct. By accepting an upfront fee for this service, respondent also admits he engaged in the unlawful practice of debt adjusting in North Carolina in violation of N.C. Gen. Stat. § 14-424. Finally, respondent admits he engaged in the unauthorized practice of law in violation of N.C. Gen. Stat. § 84-4 and Rule 5.5 of the North Carolina Rules of Professional Conduct.

## G.   The Pennsylvania Matter

Client J hired Brunty and was communicating with Integrity employees. After Brunty was placed on interim suspension, Client J was advised by Integrity employees that her file had been assigned to respondent's firm. The Integrity employees had her confidential information and attempted to get her to sign paperwork authorizing respondent to represent her. Client J never became a client of respondent's firm. Respondent admits his conduct in this matter violated Rules 1.16(a) and 5.3 of the Pennsylvania Rules of Professional Conduct.

## H.   The Texas Matters

Client K, a former Brunty client, made a payment of $800 to respondent's firm to represent him. He later received a refund of $400.

Client L paid respondent's office $2,900 to represent him in obtaining a loan modification; the lender ultimately denied the modification.

Client M, a former Brunty client, paid respondent firm $250 to represent her.

Respondent was not licensed to practice law in Texas and admits his conduct violated Section 81.102 of the Texas Government Code. Furthermore, respondent admits he violated Rule 1.14(a) of the Texas Rules of Professional Conduct which requires that an unearned fee belongs to the client who paid it and must be held in a trust account until earned. Finally, respondent admits his conduct also constituted the unauthorized practice of law in violation of Rule 5.05 of the Texas Rules of Professional Conduct.

## I.   The Virginia Matter

Client N paid respondent's firm $2,500 after an INMN employee identified herself as an Intake Specialist with respondent's firm. The employee gave the same misleading information to Client N that was given to Client E in the Georgia matter discussed above.

Respondent admits he failed to ensure the conduct of INMN employees was compatible with his professional obligation and therefore violated Rules 5.3(a) and 7.1(a) of the Virginia Rules of Professional Conduct. Additionally, respon-

dent admits his conduct constituted the unauthorized practice of law in violation of Rule 5.5 of the Virginia Rules of Professional Conduct.

## J. The Washington Matters

Client O hired Brunty and paid him in full. Shortly after respondent hired Integrity and INMN, Client O was advised his file had been transferred to respondent. Integrity employees continued to work on his file even though he did not officially become respondent's client for a few months. Respondent briefly negotiated on Client O's behalf without charging a fee before the loan modification was denied.

Clients P and Q, who were married, authorized respondent to negotiate a loan modification on their behalf. Client P paid respondent's firm $2,495.

Respondent admits he did not ensure the conduct of Integrity's employees was compatible with his professional obligations in violation of Rule 5.3 of the Washington State Rules of Professional Conduct (WSRPC). By negotiating loan modifications on behalf of Washington residents, respondent admits he engaged in the unauthorized practice of law in Washington in violation of Rule 5.5, WSRPC. Additionally, respondent admits he acted without a license in violation of Washington's Mortgage Broker Practices Act and Consumer Loan Act. Wash. Rev. Code Ann. §§ 19.146.005 to 19.146.905 and §§ 31.04.015 to 31.04.310. Further, because respondent did not have a written advance fee agreement with Clients P and Q, he admits he violated Rule 1.15A(c)(2) of the Washington Rules of Professional Conduct.

## The Advertising Matter

Respondent's website for his law firm contained three instances of language that compared his services with services of other lawyers in a way that could not be factually substantiated. The website also indicated that the attorneys in respondent's firm had the "expertise" to assist clients in specific practice areas.

## Violations of Rules of Professional Conduct

■ Respondent admits that by his conduct in the Loan Modification Matters and the Advertising Matter, he has

violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 5.5 (a lawyer may not practice law in a jurisdiction in which the lawyer has not been admitted to practice); Rule 7.1(c) (a lawyer shall not make false or misleading communications about the lawyer, including statements that compare the lawyer's services with other lawyer's services, unless the comparison can be factually substantiated); and Rule 7.4(b) (any lawyer who concentrates in a particular field may not use any form of the word "expert" in his advertisements).

Respondent admits his misconduct constitutes grounds for discipline under Rule 7(a)(1), (2), and (5), RLDE, Rule 413, SCACR (it shall be a ground for discipline for a lawyer to: (a)(1) violate the Rules of Professional Conduct, Rule 407, SCACR, (a)(2) engage in conduct violating applicable rules of professional conduct in another jurisdiction); and (a)(5) engage in conduct tending to pollute the administration of justice or to bring the legal profession into disrepute or conduct demonstrating an unfitness to practice law).

### Conclusion

█ We accept the Agreement for Discipline by Consent and impose a definite suspension for six months from the practice of law from the date of this order.

Respondent shall pay restitution as follows:

(a) $1,500.00 to Client A;

(b) $966 to Client D;

(c) $367 to Client E;

(d) $725 to Client F;

(e) $2,900 to Clients H and I;

(f) $400 to Client K;

(g) $2,900 to Client L;

(h) $250 to Client M;

(i) $2,500 to Client N; and

(j) $2,495 to Client P.

Within thirty (30) days of the date of this opinion, ODC and respondent shall enter into a restitution agreement specifying the terms upon which respondent shall pay restitution to his former clients as ordered by this opinion. Respondent shall

receive credit for any documented refunds he has had made to these individuals.

Prior to seeking reinstatement, respondent shall complete the Legal Ethics and Practice Program Ethics School pursuant to Rule 32, RLDE. Within one year of the date of this order, respondent shall complete the Legal Ethics and Practice Program Trust Account School and Advertising School and submit proof of completion of these programs to the Commission on Lawyer Conduct (the Commission).

Within thirty (30) days of the date of this opinion, respondent shall pay the costs incurred in the investigation and prosecution of this matter by ODC and the Commission.

Within fifteen days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30, RLDE, Rule 413, SCACR.

**DEFINITE SUSPENSION.**

BEATTY, C.J., KITTREDGE, HEARN and FEW, JJ., concur. JAMES, J., not participating.